IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WESTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, on behalf of itself, C. WAYNE DORE, CHRISTY SMITH, LEE NETTLES, and DIANE NETTLES, on behalf of themselves and a proposed class of similarly situated persons defined below, <br><br><div align="right">Plaintiffs,</div><br> v. <br><br> MASSACHUSETTS INSTITUTE OF TECHNOLOGY, <br><br><div align="right">Defendant.</div> | CIVIL ACTION NO. 3:15-CV-30024-MGM <br><br> **PLAINTIFFS' OPPOSITION TO MOTION TO STAY OR DISMISS** <br><br> **LEAVE TO FILE MEMORANDUM IN EXCESS OF 20 PAGES GRANTED ON JUNE 11, 2015** <br><br> **[ORAL ARGUMENT REQUESTED]** |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND FACTS ................................................................................... 5

III.  LEGAL STANDARD ........................................................................................ 6

IV.   ARGUMENT ..................................................................................................... 8

    A.   Neither Dismissal Nor Stay of This Case Is Appropriate Under the Doctrine of Primary Jurisdiction. ........................................................................................ 9

        i.    MIT's Primary Jurisdiction Argument Is Wholly Inapplicable to Plaintiffs' Rehabilitation Act Claim. ........................................................... 9

        ii.   A Stay or Dismissal of the Title III Claim Is Inappropriate Because Plaintiffs Plausibly Assert a Claim That Does Not Implicate the Primary Jurisdiction Doctrine. ................................................................... 9

        iii.  Even if the Primary Jurisdiction Doctrine Were Applicable, No Factors Are Present Which Necessitate Invoking the Doctrine, and Delay Would Prejudice Plaintiffs. ......................................................................... 12

        iv.   The Court May Obtain the Expertise of DOJ Through Statements of Interest Without the Delay of a Stay or Dismissal. .................................... 14

    B.   Plaintiffs Have Stated a Claim Under the Rehabilitation Act. ............................. 15

        i.    Plaintiffs Have Properly Alleged the Elements of a Claim Under the Rehabilitation Act. .................................................................................... 16

        ii.   MIT's Refusal to Provide Deaf and Hard of Hearing Persons Access to the Vast Majority of its Online Content Violates the Rehabilitation Act and ED Implementing Regulations. ...................................................... 17

            a.   The Plain Language of the Rehabilitation Act Prohibits MIT's "Caption Virtually Nothing" Approach. ....................................... 17

            b.   ED Regulations Prohibit MIT from Failing to Caption Nearly All of its Online Content. ............................................................... 18

            c.   That ED Regulations Do Not Specifically Address the Accessibility of Online Content Does Not Excuse MIT from Complying with the Rehabilitation Act and the General Provisions Regulations. .............................................................. 23

            d.   MIT's Arguments Regarding "Facilities" and "Post-Secondary" Regulations Are Unavailing. ...................................................... 25

    C.   Plaintiffs Have Stated a Claim That MIT's Failure to Caption its Online Video Content Violates Title III of the Americans with Disabilities Act. ...................... 26

i.      Plaintiffs Have Properly Alleged the Elements of a Claim Under
        Title III. .................................................................................................. 27

ii.     Plaintiffs Have Properly Alleged That MIT, as an Undergraduate,
        Postgraduate Private School or Other Place of Education, Is a Place of
        Public Accommodation............................................................................. 27

iii.    Plaintiffs Have Stated a Claim that MIT Denies Them the Full and
        Equal Opportunity to Enjoy MIT's Online Content by Failing to
        Provide the Auxiliary Aid of Accurate Closed Captioning. ..................... 29

        a.      MIT Does Not Assert That its Online Offerings Are Equally
                Available to Individuals Who Are Deaf and Hard of Hearing by
                the Use of Auxiliary Aids and Services Other than Captions....... 30

        b.      The Narrow Inventory Exception Does Not Apply Because
                Captioning Is an Auxiliary Aid, Not a Separate "Good.".............. 31

        c.      MIT Improperly Relies on Title III's Facility Construction,
                Alteration, and Physical Barrier Removal Rules to Avoid
                Plaintiff's Title III Discrimination Claim. .................................... 34

V.      CONCLUSION............................................................................................. 35

# TABLE OF AUTHORITIES

## CASES

*Access Now, Inc. v. Holland Am. Line-Westours, Inc.*,
   147 F. Supp. 2d 1311 (S.D. Fla. 2001) ................................................................. 24

*Alvarez ex rel. Alvarez v. Fountainhead, Inc.*,
   55 F. Supp. 2d 1048 (N.D. Cal. 1999) ................................................................... 4

*Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot.*,
   163 F.3d 74 (1st Cir. 1998) ........................................................................ 10, 13

*Am. Council of the Blind v. Paulson*,
   525 F.3d 1256 (D.C. Cir. 2008) ........................................................................... 15

*Arnold v. United Parcel Serv., Inc.*,
   136 F.3d 854 (1st Cir. 1998) ............................................................................... 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................... 7

*Auer v. Robbins*,
   519 U.S. 452 (1997) ........................................................................................... 4

*Ball v. AMC Entertainment, Inc.*,
   246 F. Supp. 2d 17 (D.D.C. 2003) ...................................................................... 32

*Barden v. City of Sacramento*,
   292 F.3d 1073 (9th Cir. 2002) ............................................................................ 18

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................ 7, 8

*Bragdon v. Abbott*,
   524 U.S. 624 (1998) ........................................................................................... 4

*Brown v. MCI WorldCom Network Servs., Inc.*,
   277 F.3d 1166 (9th Cir. 2002) ............................................................................ 12

*Burkhart v. Washington Metro. Area Transit Auth.*,
   112 F.3d 1207 (D.C. Cir. 1997) ......................................................................... 31

*Carparts Distribution Center v. Automotive Wholesaler's Association*,
   37 F.3d 12 (1st Cir. 1994) .................................................................................. 28

*Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*,
   467 U.S. 837 (1984) ........................................................................................... 4

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig.*,
No. 12-MD-2320-PB, 2013 WL 1124081 (D.N.H. Mar. 18, 2013) .................................. 7-8, 9

*Colo. Cross-Disability Coalition v. Abercrombie & Fitch Co.*,
765 F.3d 1205 (10th Cir. 2014)................................................................................ 35

*Coppi v. City of Dana Point*,
No. SACV 11-1813 JGB, 2015 WL 757241 (C.D. Cal. Feb. 23, 2015).................................. 24

*Cty of Santa Clara v. Astra U.S.*,
588 F.3d 1237 (9th Cir. 2009)................................................................................ 7, 9

*DeVargas v. Mason & Hanger-Silas Mason Co.*,
911 F.2d 1377 (10th Cir. 1990)................................................................................ 18

*Doe v. Mutual Omaha Ins. Co.*,
179 F.3d 557 (7th Cir. 1999)................................................................................ 28, 33

*Dudley v. Hannaford Bros. Co.*,
333 F.3d 299 (1st Cir. 2003) ............................................................................. 1, 2, 5, 31

*Eggert v. Merrimac Paper Co. Leveraged Employee Stock Ownership Plan & Trust*,
311 F. Supp. 2d 245 (D. Mass. 2004) ...................................................................... 4, 8

*Feldman v. Pro Football, Inc.*,
579 F. Supp. 2d 697 (D. Md. 2008) ...................................................................... 30

*Fortyune v. City of Lomita*,
766 F.3d 1098 (9th Cir. 2014)................................................................................ 23, 24

*Gagliardi v. Sullivan*,
513 F.3d 301 (1st Cir. 2008) ............................................................................. 7

*George v. Bay Area Rapid Transit*,
577 F.3d 1005 (9th Cir. 2009)................................................................................ 25

*Hammond v. City of Red Bluff*,
No. 2:14-CV-01136-TLN, 2014 WL 6612059 (E.D. Cal. Nov. 20, 2014).............................. 24

*Ingram v. Rencor Controls, Inc.*,
217 F. Supp. 2d 141 (D. Me. 2002) ...................................................................... 7, 8

*Innes v. Bd. of Regents of Univ. Sys. of Md.*,
29 F. Supp. 3d 566 (D. Md. 2014) ...................................................................... 30, 35

*Jacobs v. Soars*, No. 14-12536-LTS, 2014 WL 7330762 (D. Mass. Dec. 2, 2014) ................ 2, 27

*Jancik v. Redbox Automated Retail, LLC*,
   No. SACV 13-1387-DOC, 2014 WL 1920751 (C.D. Cal. May 14, 2014) .............................. 33

*Johnson v. City of Saline*,
   151 F.3d 564 (6th Cir. 1998) ................................................................................................ 18

*Karczewski v. K Motors, Inc.*,
   No. 14CV2701-MMA, 2015 WL 1470651 (S.D. Cal. Mar. 21, 2015) .................................... 32

*Locust Cartage Co. v. Transamerican Freight Lines, Inc.*,
   430 F.2d 334 (1st Cir. 1970) ........................................................................................ 13, 14

*Lovell v. Chandler*,
   303 F.3d 1039 (9th Cir. 2002) .............................................................................................. 16

*Majocha v. Turner*,
   166 F. Supp. 2d 316 (W.D. Pa. 2001) .................................................................................. 29

*Mashpee Tribe v. New Seabury Corp.*,
   592 F.2d 575 (1st Cir. 1979) ................................................................................................ 13

*Massachusetts v. E\*Trade Access, Inc.*,
   464 F. Supp. 2d 52 (D. Mass. 2006) ............................................................................. 33, 35

*McInerney v. Rensselaer Polytechnic Inst.*,
   505 F.3d 135 (2nd Cir. 2007) ............................................................................................... 10

*McNeil v. Times Ins. Co.*,
   205 F.3d 179 (5th Cir. 2000) ................................................................................................ 32

*Morgan v. Joint Admin. Bd., Ret. Plan of the Pillsbury Co.*,
   268 F.3d 456 (7th Cir. 2001) ................................................................................................ 28

*Nat'l Fed'n of the Blind v. Scribd, Inc.*,
   No. 2:14-CV-162, 2015 WL 1263336 (D. Vt. Mar. 19, 2015) ............................................... 28

*Nat'l Fed'n of the Blind v. Target Corp.*,
   452 F. Supp. 2d 946 (N.D. Cal. 2006) ........................................................................... 28, 31

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*,
   869 F. Supp. 2d 196 (D. Mass. 2012) ................................................................ 14, 24, 28, 31

*Newman v. Piggie Park Enterprs.*,
   390 U.S. 400 (1968) ............................................................................................................... 3

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. 2013) .................................................................................... 8

*Ocasio-Hernández v. Fortuño-Burset*,
 640 F.3d 1 (1st Cir. 2011) ........................................................................................... 7

*Olmstead v. L.C. ex rel. Zimring*,
 527 U.S. 581 (1999) ..................................................................................................... 4

*P.R. Tel. Co. v. WorldNet Telecomm. Inc.*,
 52 F. Supp. 3d 370 (D.P.R. 2014) ............................................................................. 13

*Palmer Foundry, Inc. v. Delta-HA, Inc.*,
 319 F. Supp. 2d 110 (D. Mass. 2004) ................................................................. 11, 13

*Reiter v. Cooper*,
 507 U.S. 258 (1993) ................................................................................................... 10

*Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority*,
 718 F.2d 490 (1st Cir. 1983) ............................................................................... 24, 25

*Robertson v. Las Animas Cnty. Sheriff's Dep't*,
 500 F.3d 1185 (10th Cir. 2007) ................................................................................. 25

*Rothschild v. Grottenthaler*,
 907 F.2d 286 (2d Cir. 1990) ........................................................................................ 2

*Royal Siam Corp. v. Chertoff*,
 484 F.3d 139 (1st Cir. 2007) ..................................................................................... 19

*Ruiz v. Bally Total Fitness Holding Corp.*,
 496 F.3d 1 (1st Cir. 2007) ......................................................................................... 17

*Rymes Heating Oils, Inc. v. Springfield Terminal Ry. Co.*,
 358 F.3d 82 (1st Cir. 2004) ....................................................................................... 13

*Snyder v. Lady Slings the Booze, LLC*,
 No. 3:12-CV-00659-CRS, 2014 WL 7366665 (W.D. Ky. Dec. 24, 2014) .............................. 35

*State of Arizona ex rel. Goddard v. Harkins Administrative Services, Inc.*,
 No. CV-07-00703-PHX-ROS, 2011 U.S. Dist. LEXIS 127682 (D. Ariz. Feb. 8, 2011) .... 10, 11

*State of Arizona ex rel. Goddard v. Harkins Administrative Services, Inc.*,
 603 F.3d 666 (9th Cir. 2010) ........................................................................... 30, 32, 33

*State St. Bank & Trust Co. v. Denman Tire Corp.*,
 240 F.3d 83 (1st Cir.2001) ........................................................................................... 7

*Syntek Semiconductor Co. v. Microchip Tech., Inc.*,
 307 F.3d 775 (9th Cir. 2002) ..................................................................................... 10

*Talk Am., Inc. v. Michigan Bell Tel. Co.*,
   131 S. Ct. 2254 (2011) ................................................................................................ 19

*TCG N.Y., Inc. v. City of White Plains*,
   305 F.3d 67 (2d Cir. 2002) ........................................................................................ 14

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) .................................................................................................... 4

*Thomas v. Northwest Airlines Corp.*,
   No. 08-11580, 2011 U.S. Dist. LEXIS 91149 (E.D. Mich. Aug. 16, 2011) ............ 35

*Tompkins v. United Health Care of New England*,
   203 F.3d 90 (1st Cir. 2000) ...................................................................................... 28

*U.S. Pub. Interest Grp. v. Atl. Salmon of Maine, LLC*,
   339 F.3d 23 (1st Cir. 2003) ...................................................................................... 13

*United States v. Hoyts Cinemas Corp.*,
   380 F.3d 558 (1st Cir. 2004) ...................................................................................... 4

*United States v. Nat'l Amusements, Inc.*,
   180 F. Supp. 2d 251 (D. Mass. 2001) ...................................................................... 35

*United States v. W. Pac. R.R. Co.*,
   352 U.S. 59 (1956) ............................................................................................. 10, 11

*Weber v. Cranston Sch. Comm.*,
   212 F.3d 41 (1st Cir. 2000) ........................................................................................ 8

*Weyer v. Twentieth Century Fox Film Corp.*,
   198 F.3d 1104 (9th Cir. 2000) .................................................................................. 28

*Winslow v. IDS Life Ins. Co.*,
   29 F. Supp. 2d 557 (D. Minn. 1998) ........................................................................ 28

## <u>STATUTES</u>

28 U.S.C. § 517 ............................................................................................................. 3

29 U.S.C. § 701(c)(2) .................................................................................................. 15

29 U.S.C. § 794 ............................................................................................................. 1

29 U.S.C. § 794(a) ...................................................................................................... 17

29 U.S.C. § 794(b) ................................................................................................. 15, 23

29 U.S.C. § 794(b)(2)(A) ............................................................................................ 17

42 U.S.C. § 12101(a)(3) ................................................................................... 27

42 U.S.C. § 12101(b)(1) ................................................................................... 27

42 U.S.C. § 12103(1)(A) .................................................................................. 29

42 U.S.C. § 12181 .............................................................................................. 1

42 U.S.C. § 12181(7)-(J) ................................................................................. 27

42 U.S.C. § 12182(a) ....................................................................................... 27

42 U.S.C. § 12182(b)(2)(A)(iii) .............................................................. 29, 30, 33

42 U.S.C. § 12188 ............................................................................................ 11

47 U.S.C. § 613(c)(2)(A) .............................................................................. 5, 29

Civil Rights Restoration Act of 1987, Pub. L. No. 100–259, 102 Stat. 28 (1988) ................. 17-18

## REGULATIONS

28 C.F.R. § 35.150(a) ...................................................................................... 24

28 C.F.R. § 35.151 .......................................................................................... 24

28 C.F.R. § 36.201(a) ...................................................................................... 27

28 C.F.R. § 36.303(a)-(c) ................................................................................ 29

28 C.F.R. § 36.304 .......................................................................................... 35

28 C.F.R. § 36.307(a)–(c) ................................................................................ 31

28 C.F.R. Part 36, Appendix C, Subpart C ................................................. 30, 33

34 C.F.R. Part 104 .......................................................................................... 18

34 C.F.R. § 104.3 ........................................................................................... 25

34 C.F.R. § 104.4(b)(1) ................................................................................... 15

34 C.F.R. § 104.4(b)(1)(i)-(vii) .................................................................... 19, 20

34 C.F.R. § 104.4(b)(4) ................................................................................... 19

47 C.F.R. § 79.4 ............................................................................................. 29

Nondiscrimination on the Basis of Disability by Public Accommodations and in
    Commercial Facilities,
    56 Fed. Reg. 35544, 35566 (July 26, 1991) ................................................................. 21, 29, 35

Nondiscrimination on the Basis of Disability; Accessibility of Web Information and
    Services of State and Local Government Entities and Public Accommodation,
    75 Fed. Reg. 43460, 43464 (July 26, 2010),
    http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201504&RIN=1190-AA61 ....... 3

## OTHER AUTHORITIES

Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, DOJ,
    to Tom Harkin, U.S. Senator (Sept. 9, 1996), available at
    http://www.justice.gov/crt/foia/readingroom/frequent_requests/ada_tal/tal712.txt)
    (last viewed June 22, 2015) ........................................................................................... 4

Letter from Meena Morey Chandra, Director of U.S. Dept. of Ed. Office for Civil Rights,
    Region XV, to James Tressel, President of Youngstown State University (Dec. 12, 2014),
    http://www2.ed.gov/documents/press-releases/youngstown-state-university-letter.pdf ........... 22

Letter from Meena Morey Chandra to Santa J. Ono, President of the University of Cincinnati
    (Dec. 14, 2014), http://www2.ed.gov/documents/press-releases/university-cincinnati-
    letter.pdf ...................................................................................................... 22, 23

U.S. Dep't of Justice Statement of Interst on Motion to Dismiss, Oct. 3, 2011,
    *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, Case No. 11-CV-30168-MAP (D. Mass.),
    ECF No. 24 ................................................................................................... 3, 11

Court Memorandum and Order Regarding Defendant's Motion to Dismiss, Nov. 10, 2011,
    *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, Case No. 11-CV-30168-MAP (D. Mass.),
    ECF No. 32 ...................................................................................................... 14

U.S. Dep't of Justice Statement of Interest on Mot. for Judgment on the Pldgs., May 15, 2012,
    *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, Case No. 11-CV-30168-MAP (D. Mass.),
    ECF No. 45 ...................................................................................................... 3, 4

Consent Decree, Oct. 10, 2012,
    *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, Case No. 11-CV-30168-MAP (D. Mass.),
    ECF No. 88 ......................................................................................................... 5

U.S. Dep't of Justice Statement of Interest in Opposition to Motion to Dismiss, Dec. 21, 2010,
    *State of Arizona ex rel. Goddard v. Harkins Administrative Services, Inc.*,
    No. CV-07-00703-PHX-ROS, (D. Ariz.), ECF No. 75 .................................................... 11, 13

Open Education Consortium, *Open Education at Massachusetts Institute of Technology (MIT),
    the United States:* Interview of Shigeru Miyagawa, Chair of the MIT OpenCourseWare
    Faculty Advisory Committee, http://www.oeconsortium.org/projects/impact-of-openness-
    on-institutions/massachusetts-institute-of-technology/ (last visited June 23, 2015) ................... 1

U.S. Dep't of Educ., Auxiliary Aids and Services for Postsecondary Students with
    Disabilities, http://www2.ed.gov/about/offices/list/ocr/docs/auxaids.html (last visited
    June 23, 2015) ................................................................................................................ 26

U.S. Dep't of Educ., Frequently Asked Questions about the June 29, 2010, Dear Colleague
    Letter (May 26, 2011), http://www2.ed.gov/about/offices/list/ocr/docs/dcl-ebook-faq-
    201105.pdf (last viewed June 22, 2015) ...................................................................... 21

U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter (June 29, 2010),
    http://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100629.pdf (last visited
    June 22, 2015) ................................................................................................................ 20

U.S. Dep't of Justice and U.S. Dep't. of Educ., Frequently Asked Questions on Effective
    Communication for Students with Hearing, Vision, or Speech Disabilities in Public
    Elementary and Secondary Schools (Nov. 2014),
    http://www2.ed.gov/about/offices/list/ocr/docs/dcl-faqs-effective-communication-
    201411.pdf, at pp. 2, 13 ( last visited June 23, 2015) ............................................. 26

U.S. Dep't of Justice Title III Technical Assistance Manual § III-4.2500 (Accessible or
    Special Goods), http://www.ada/gov/taman3.html .................................................. 33

Univ. of Cincinnati Resolution Agreement, Office of Civil Rights Compliance Review
    #15-13-6001 (Dec. 8, 2014), http://www2.ed.gov/documents/press-releases/university-
    cincinnati-agreement.pdf ............................................................................................. 22

Univ. of Montana Resolution Agreement,
    http://www.umt.edu/accessibility/docs/FinalResolutionAgreement.pdf.................................. 23

Youngstown State Univ. Resolution Agreement, Office of Civil Rights Compliance Review
    #15-13-6002 (Nov. 24, 2014), http://www2.ed.gov/documents/press-releases/
    youngstown-state-university-agreement.pdf .................................................................. 22, 23

Plaintiffs oppose the Motion to Stay or Dismiss submitted by defendant Massachusetts Institute of Technology ("MIT" or "Defendant") for the following reasons.

## I.   INTRODUCTION

The National Association of the Deaf ("NAD") and several deaf and hard of hearing individuals (collectively "Plaintiffs") have brought this declaratory and injunctive relief action to gain access to the benefits of MIT's video and audio online speeches, talks, lectures and courses by renowned speakers and guests ("Online Content")[1] that MIT has made "open and available to the world." Compl. ¶ 28 nn.6-7.[2] This content has been watched by millions of people. *Id.* ¶¶ 1, 45, 48, 53. But, by failing to provide closed captions or by providing inaccurate captions, MIT deprives deaf and hard of hearing persons equal access to this wide array of online opportunities.

Plaintiffs seek to enforce two longstanding civil rights statutes, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2012) ("Rehabilitation Act") and Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 *et seq.* (2012 & Supp. 2014) ("Title III"), which were enacted to prohibit exactly this type of discrimination.[3] The Rehabilitation Act is applicable because MIT receives hundreds of millions of dollars each year in federal money.

---

[1] The Complaint addresses MIT's failure to provide captioning on videos and audio tracks, both of which make MIT's Online Content inaccessible to deaf and hard of hearing individuals. However, for ease of reference and consistent with MIT's approach, *see* MIT's Memorandum in Support of Motion to Stay or Dismiss ("MTD") n.1, ECF No. 25, Plaintiffs will primarily refer to MIT's video content.

[2] *See also* Open Education Consortium, *Open Education at Massachusetts Institute of Technology (MIT), the United States:* Interview of Shigeru Miyagawa, Chair of the MIT OpenCourseWare Faculty Advisory Committee, http://www.oeconsortium.org/projects/impact-of-openness-on-institutions/massachusetts-institute-of-technology/ (last visited June 23, 2015) ("Anyone is free to use [OpenCourseWare]…[i]n fact it is part of our mission to share what we have produced with the rest of the world.").

[3] These laws "send[ ] a bluntly worded message to those establishments that fall within its purview: you may not discriminate against an individual in the full and equal access to goods and services on the basis of a disability." *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003) ("Congress enacted the ADA to 'to address the major areas of discrimination faced day-to-day by people with disabilities'" (citation omitted)).

Compl. ¶ 25. MIT falls under Title III because, as a university, it is a public accommodation. *Id.* ¶ 103.

Both the Rehabilitation Act and Title III ensure that colleges and universities provide people with disabilities equal access to their programs and activities. MIT does not dispute that Plaintiffs meet the essential elements necessary to state a claim under these laws: MIT does not dispute that Plaintiffs are disabled; that MIT receives federal funds;[4] that it is a public accommodation;[5] that its online offerings are programs and activities covered by Title III or among "all the operations" of a university covered by the Rehabilitation Act;[6] or that it fails to provide equal access to its online offerings to persons who are deaf and hard of hearing who cannot access the aural content without captions.[7] *See Rothschild v. Grottenthaler*, 907 F.2d 286, 289-90 (2d Cir. 1990) (listing elements of Rehabilitation Act claim); *Jacobs v. Soars*, No. 14-12536-LTS, 2014 WL 7330762, at *4 (D. Mass. Dec. 2, 2014) (listing elements of Title III claim).

Failing to meet its burden as the movant on a motion to dismiss by countering that Plaintiffs have met the essential elements of a Rehabilitation Act or Title III claim, MIT seeks to deny this Court jurisdiction or, alternatively, to obtain dismissal by prematurely raising issues that are, at best, questions of fact.

*First*, MIT argues that this case should be stayed or dismissed under the primary jurisdiction doctrine and referred to the Department of Justice ("DOJ"). MIT ignores the role Congress assigned to courts to in the enforcement of these two laws. *See Dudley*, 333 F.3 at 307 ("'Congress evinced its understanding that enforcement would be difficult and that the Nation

---

[4] *See* Compl. ¶¶ 4, 6, 25-26, 95.
[5] *See* Compl. ¶¶ 6, 27, 103.
[6] *See* Compl. ¶¶ 4, 27-29, 96.
[7] *See* Compl. ¶¶ 2, 7-9, 28-63, 97-100.

would have to rely in part upon private litigation as a means of securing broad compliance.'")

(quoting *Newman v. Piggie Park Enterprs.*, 390 U.S. 400, 401 (1968)).

While DOJ enforces Title III of the ADA, it does not enforce the Rehabilitation Act, a statute administratively enforced by the Department of Education ("ED"). Even though Congress charged DOJ with Title III rulemaking, Congress gave DOJ no adjudicatory administrative authority to provide injunctive relief. Its rulemaking on online access, moreover, has been pending since 2010, and proposed regulations for comment have been repeatedly delayed, most recently until April 2016.[8]

Nor is there need for a referral because DOJ has already addressed the question at the heart of this case in Statements of Interest submitted to courts.[9] *See, e.g., Nat'l Ass'n of the Deaf v. Netflix, Inc.*, Case No. 11-CV-30168-MAP (D. Mass), DOJ Statement of Interest on Motion to Dismiss, Oct. 3, 2011, ECF No. 24, and DOJ Statement of Interest on Motion for Judgment on the Pleadings, May 15, 2012, ECF No. 45. DOJ explained that for almost two decades it has interpreted Title III to cover the online content of public accommodations.[10] *See Netflix*, DOJ Statement of Interest, ECF No. 45 at p.10 (citing Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, DOJ, to Tom Harkin, U.S. Senator (Sept. 9, 1996), available at http://www.justice.gov/crt/foia/readingroom/frequent_requests/ada_tal/tal712.txt

---

[8] *See* Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodation, available at http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201504&RIN=1190-AA61 (identifying date for NPRM).

[9] *See* 28 U.S.C. § 517 (DOJ may "attend to the interests of the United States" in any suit pending in the district courts).

[10] In its 2010 rulemaking notice, DOJ stated that it "has repeatedly affirmed the application of title III to Web sites of public accommodation." Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodation, 75 Fed. Reg. 43460, 43464 (July 26, 2010) (reiterating Assistant Attorney General Patrick's letter and identifying several amicus briefs).

(last viewed June 22, 2015)). Courts give deference to the policy views expressed by the DOJ in its regulations, publications, and amicus briefs. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-98 & n.9 (1999) (Title II ADA case); *Alvarez ex rel. Alvarez v. Fountainhead, Inc.*, 55 F. Supp. 2d 1048, 1055 (N.D. Cal. 1999) (deference to DOJ "regulations, publications, and amicus brief").[11] That the Title III "regulatory process is not yet complete does not support any inference whatsoever that web-based services are not covered by the ADA, or should not be covered by the ADA." *Netflix*, DOJ Statement of Interest, ECF No. 45, at p. 12. Finally, the Court can obtain DOJ's views without a stay or dismissal. DOJ has stated that it intends to participate in this case, as in *Netflix*, through a Statement of Interest. *See* DOJ Motion for Leave to File Statement of Interest in Excess of 20 Pages, June 22, 2015, ECF No. 32.

*Second*, MIT raises factual issues that cannot be resolved in a motion to dismiss. *See infra* at 6-8. It baldly asserts that closed captioning, the relief Plaintiffs seek, is so burdensome that MIT will remove its online videos rather than caption them – that is, to "caption or remove." MTD at 1, 2, 4. Undue burden is an affirmative defense which requires a factual record that is absent here. Courts, moreover, should not determine relief on a motion to dismiss because the issue of remedies is "more appropriately considered on a motion for summary judgment after discovery and the development of a factual record." *Eggert v. Merrimac Paper Co. Leveraged Employee Stock Ownership Plan & Trust*, 311 F. Supp. 2d 245, 258 (D. Mass. 2004).

---

[11] *See also Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) ("[a]s the agency directed by Congress to issue implementing regulations, to render technical assistance explaining the responsibilities of covered individuals and institutions, and to enforce Title III . . . the [DOJ's] are entitled to deference."); *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 567 (1st Cir. 2004) (holding that deference to the DOJ's interpretation of its own ADA Title III regulation was "proper even though the Department's gloss is offered only in a brief rather than in some more formal manner") (citing *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997)); *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994).

MIT also suggests that an injunction ordering captioning would be so burdensome that it would spell the end of the Internet worldwide. *See* MTD at 6. This doomsday claim, at best, is premature before discovery and trial. In any event, the Consent Decree in *Netflix*, of course, has not put Netflix out of business. *See Netflix*, *supra*, ECF No. 88 (Oct. 10, 2012 Consent Decree). Nor has the federal law requiring that television shows must be closed captioned put broadcasters out of business. *See* Twenty First Century Communications and Video Accessibility Act ("CVAA"), 47 U.S.C. § 613(c)(2)(A) (2012 & Supp. 2014); *see also infra* at 29.[12] MIT, furthermore, is unable to demonstrate as a matter of law that either the Rehabilitation Act or Title III categorically bars closed captioning.

## II.    BACKGROUND FACTS

MIT asserts that its Online Content is "open and available to the world," "widely available to everyone," and available "for anyone with access to the Internet." Compl. ¶¶ 2, 28, 42 & n.9. Millions of viewers have watched the videos. *Id*. ¶¶ 1, 45, 48, 53. MIT creates and produces the Online Content, and also controls, maintains and/or administers webpages, websites and other Internet locations where the content is posted ("MIT Platforms"). *Id*. ¶ 28.

MIT acknowledges that closed captions "make videos accessible to those who are deaf or hard of hearing," but the vast majority of MIT's Online Content is not captioned and thus inaccessible to deaf or hard of hearing individuals. *See id.* ¶¶ 3 & n.3. MIT has posted large quantities of content that have absolutely no or unintelligible captioning, and has used administrative methods and practices that result in ineffective captioning on MIT Platforms containing thousands of videos. *Id*. ¶¶ 2, 32-41, 47-49, 51-52, 54-56, 58, 63.

---

[12] *See Dudley*, 333 F.3d at 309-10 (subjecting defendant's "doomsday" claims in disability access cases to "frank appraisal" of the factual circumstances, finding defendant's concerns to be "overstated" and "farfetched").

Plaintiff NAD and the individual Plaintiffs as well as a class of other deaf and hard of hearing individuals bring this action to obtain closed captioning of MIT's Online Content to ensure equal, effective, and timely access to this content. *Id.* ¶ 10; *see also id.* p. 30 (Prayer for Relief).

Plaintiff Christy Smith, for instance, is a resident of Colorado who is substantially limited in the major life activity of hearing and requires captioning to be able to participate in and receive the benefit of MIT's Online Content. *Id.* ¶ 21. She tried to access MIT's Online Content on six MIT Platforms, but found uncaptioned or erroneously captioned content on each of them. *Id.* ¶ 70. She was denied the benefit of many of the videos she tried to watch. *Id.* ¶ 69. In the future, Plaintiff Smith would like to access MIT's Online Content. *Id.* ¶ 71.

While the MIT Platforms vary with respect to the videos available and amount of viewership, they all have uncaptioned and inaccurately captioned videos that are inaccessible to deaf and hard of hearing individuals. *See id.* ¶¶ 28-31, 42-63. For example, MIT makes its Online Content available through numerous channels on YouTube, including the MIT News channel, which has more than 56,000 subscribers and has received more than 18 million views, and the MIT OpenCourseWare channel, which contains MIT course content open to the public, and has more than 661,000 subscribers and has received more than 60 million views. *Id.* ¶¶ 42, 46, 53. However, many of these videos are uncaptioned, such as 2014 lectures on "Finance Growth, and Volatility" and "Mind vs. Brain: Confessions of a Defector"; other videos contain unintelligible captioning, including the video of a 2009 visit by President Obama to MIT's campus. *Id.* ¶ 54.

## III.   LEGAL STANDARD

A court uses the same standard of review to assess both the alternative motions.

Case 3:15-cv-30024-MGM   Document 35   Filed 06/25/15   Page 18 of 48

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7-13 (1st Cir. 2011) (discussing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678-82 (2009)). In *Fortuño-Burset*, the Court of Appeals held that a district court erred "by not affording the plaintiffs' allegations the presumption of truth to which they were entitled." *Id*. at 14. "Nor may a court attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely.'" *Id*. at 13 (original ellipsis), quoting *Twombly*, 550 U.S. at 556.

Dismissal of a claim is improper when a complaint sets forth "'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (internal citation omitted); *Ingram v. Rencor Controls, Inc*., 217 F. Supp. 2d 141, 151 (D. Me. 2002) (question of what relief is appropriate "is not one that may be addressed in connection with a motion to dismiss; it is enough that the plaintiff has pleaded the elements of his claim."). MIT is entitled to dismissal under Rule 12(b)(6) "only if it 'appears to a certainty that the [Plaintiffs] would be unable to recover under any set of facts.'" *State St. Bank & Trust Co. v. Denman Tire Corp*., 240 F.3d 83, 87 (1st Cir.2001) (citation omitted).

Where a party seeks to invoke the primary jurisdiction doctrine at the motion to dismiss stage of litigation, a court applies the Rule 12(b)(6) standard to the primary jurisdiction analysis to consider "whether the complaint plausibly asserts a claim that would not implicate the doctrine." *Cty of Santa Clara v. Astra U.S*., 588 F.3d 1237, 1252 (9th Cir. 2009), *rev'd on other grounds; see also In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales*

*Practices Litig.*, No. 12-MD-2320-PB, 2013 WL 1124081, at *2 (D.N.H. Mar. 18, 2013).

Fact-intensive inquiries are an inappropriate basis on which to dismiss an action. *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 (D. Mass. 2013) (courts reluctant to grant a motion to dismiss when a "deeply fact-intensive inquiry" is pleaded). In particular, the issue of remedies is "more appropriately considered on a motion for summary judgment after discovery and the development of a factual record." *Eggert*, 311 F. Supp. 2d at 258; *see also Twombly,* 550 U.S. at 556; *Rencor Controls, Inc*., 217 F. Supp. 2d at 151.

## IV.    ARGUMENT

Plaintiffs have properly alleged all the elements of claims under the Rehabilitation Act and Title III. Plaintiffs are all deaf or hard of hearing. As MIT's online video services are open to the public, Plaintiffs are each qualified to participate in these services. MIT receives many millions of dollars every year in federal money and is a public accommodation. Finally, MIT has discriminated against Plaintiffs by failing to caption, or failing to caption accurately, its Online Content. Plaintiffs have therefore sufficiently asserted claims that would not implicate referral under the primary jurisdiction doctrine to DOJ, an agency with no authority to administratively enforce the two laws. These allegations are also sufficient to deny the motion to dismiss.

MIT seeks to narrow the import of broadly-worded statutes and regulations as well as to raise factual issues inappropriate for resolution in an effort to foreclose compliance. These civil rights provisions, however, should be applied to effectuate their broad, remedial purpose. *See, e.g.*, *Weber v. Cranston Sch. Comm*., 212 F.3d 41, 48 (1st Cir. 2000); *Arnold v. United Parcel Serv., Inc*., 136 F.3d 854, 861 (1st Cir. 1998) ("remedial legislation, such as the ADA, should be construed broadly to effectuate its purposes.") (citation omitted).

**A.      Neither Dismissal Nor Stay of This Case Is Appropriate Under the Doctrine of Primary Jurisdiction.**

MIT seeks to sidetrack normal processing of this case by raising the doctrine of primary jurisdiction to impose indefinite delay and prejudice to Plaintiffs. But the arguments are fatally flawed. *First*, arguments about DOJ Title III rulemaking do not apply at all to Plaintiffs' Rehabilitation Act claim, which ED, an entirely separate agency, enforces. *Second*, primary jurisdiction does not apply to the Title III claim, because the DOJ has no administrative adjudicatory process in which Plaintiffs could obtain relief. *Third*, this case does not present one of the rare instances that warrants application of the doctrine. *Fourth*, the Court may obtain DOJ's views on captioning by DOJ's participation, as in *Netflix*, via a Statement of Interest.

**i.      MIT's Primary Jurisdiction Argument Is Wholly Inapplicable to Plaintiffs' Rehabilitation Act Claim.**

The Department of Education, not the DOJ, is charged with Rehabilitation Act enforcement for colleges and universities. *See infra* at 18-23. Referral of Plaintiffs' Rehabilitation Act claim to DOJ is inappropriate. ED itself, moreover, has enforced the Rehabilitation Act to require universities to close caption their online content without waiting for DOJ's proposed rulemaking to be completed. *See infra* at 22-23.

**ii.      A Stay or Dismissal of the Title III Claim Is Inappropriate Because Plaintiffs Plausibly Assert a Claim That Does Not Implicate the Primary Jurisdiction Doctrine.**

Plaintiffs have sufficiently asserted Rehabilitation Act and Title III claims. *See supra* at 2, 8, *infra* at 16-17, 27. Thus, Plaintiffs "plausibly assert[] a claim that would *not* implicate the [primary jurisdiction] doctrine," and the Court must therefore deny MIT's motion to dismiss or stay based on the doctrine. *See Astra*, 588 F.3d at 1252 (emphasis in original); *In re Colgate-Palmolive*, 2013 WL 1124081, at *2. There is no DOJ administrative proceeding that could provide Plaintiffs, on referral, with Title III injunctive relief.

9

Under the doctrine of primary jurisdiction, a court may refer a case to an administrative agency so that plaintiffs can initiate proceedings to seek an administrative ruling. *Reiter v. Cooper*, 507 U.S. 258, 268-269 (1993); *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956); *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot.*, 163 F.3d 74, 81 (1st Cir. 1998); *Syntek Semiconductor Co. v. Microchip Tech., Inc.*, 307 F.3d 775, 782 n.3 (9th Cir. 2002) (court stays or dismisses case "so that the parties may pursue their administrative remedies" in "proceedings before the agency"). While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiffs with relief. *See W. Pac. R.R. Co.*, 352 U.S. at 63-64; *Am. Auto. Mfrs.*, 163 F.3d at 81; *Syntek*, 307 F.3d at 782 n.3.[13]

The district court considered, on remand, a similar primary jurisdiction motion in light of proposed rulemaking in *State of Arizona ex rel. Goddard v. Harkins Administrative Services, Inc.*, No. CV-07-00703-PHX-ROS, 2011 U.S. Dist. LEXIS 127682 (D. Ariz. Feb. 8, 2011), a Title III case involving equipment for movie theater captioning. The district court denied the motion, finding that: "The parties have no administrative remedies to pursue. Rather, the parties would be forced to wait for an administrative rulemaking process to conclude. The parties are not direct participants in the DOJ rulemaking process. They have no ability to impact the process beyond the general public right to comment." *Id.* at *8.

DOJ urged the court not to invoke primary jurisdiction because "[u]nlike agencies to which courts refer matters under the primary jurisdiction doctrine – such as the Interstate

---

[13] In contrast to Title I of the ADA, in which Congress requires plaintiffs to administratively exhaust before an action can be filed for employment claims, Congress provided no administrative exhaustion requirement for Title III access claims. *See McInerney v. Rensselaer Polytechnic Inst.*, 505 F.3d 135, 138-139 (2nd Cir. 2007) ("Title III, unlike Title I, does not require administrative exhaustion.").

Commerce Commission, the Commodity Exchange Commission, and the National Labor Relations Board – the DOJ does not have an adjudicative procedure under title III of the ADA that plaintiffs can initiate." *Harkins*, *supra*, DOJ Statement of Interest in Opp. to Motion to Dismiss, Dec. 21, 2010, ECF No. 75, p. 7. Nor can DOJ provide Plaintiffs with injunctive relief: DOJ must bring an action in federal court for relief. 42 U.S.C. § 12188.

In *Harkins*, the defendant, as here, asserted a defense of undue burden. The district court noted that: "While the DOJ is responsible for issuing ADA regulations, Courts routinely decide the extent to which accommodations are required under the ADA and when such accommodations constitute an undue burden . . . . Further, Congress has not provided a mechanism for the DOJ to resolve disputes regarding undue burden." 2011 U.S. Dist. LEXIS 127682, at *8. Title III captioning issues, in any event, are "straightforward statutory interpretation and liability issues that Congress committed to the federal courts . . . . Resolution of these issues does not require specialized expertise beyond the typical ken of federal courts." *Netflix*, DOJ Statement of Interest, ECF No. 24, p. 13.

Waiting for the completion of DOJ rulemaking is unnecessary. DOJ has already authoritatively interpreted Title III and its regulations to require closed captioning of the online content of public accommodations to provide equal access, for example, in *Netflix* and in the DOJ's 2010 initial notice of rulemaking. *See supra* at 3-4 and n.10.

It is therefor unsurprising that MIT does not cite a single case in which a court has invoked primary jurisdiction to refer a Title III case to DOJ.[14] MIT argues at length that the

---

[14] The cases cited by MIT, in contrast, concern referral of complex technical matters to regulatory agencies that have administrative adjudicatory processes, such as the Interstate Commerce Commission and OSHA. *See* MTD at 9-10. *See, e.g.*, *W. Pac. R.R. Co*., 352 U.S. at 64-66 (finding primary jurisdiction doctrine should be invoked to refer matter to Interstate Commerce Commission to adjudicate matters related to setting tariffs); *Palmer Foundry*, 319 F.

11

statement of principles of the proposed Title III rulemaking might be helpful to the Court, MTD

at 11-14, but that is far from the primary jurisdiction doctrine's purpose to permit courts to refer

technical questions that they are incapable of resolving to an administrative agency. Moreover,

the Court has before it a case, not a policy seminar. *Harkins*, *Netflix,* and DOJ make clear that

resolving Title III captioning issues fall well within the ability of courts to interpret statutes and

decide liability in the particular factual circumstances of a case.[15] DOJ, furthermore, will provide

its expertise to the Court through briefing. *See supra* at 4, *infra* at 14-15.

> ### iii.      Even if the Primary Jurisdiction Doctrine Were Applicable, No Factors Are Present Which Necessitate Invoking the Doctrine, and Delay Would Prejudice Plaintiffs.

Even if it were appropriate to consider invoking the doctrine, this case does not present

the factors necessary to warrant it.[16] Where the doctrine is appropriately invoked, courts consider

the following factors in assessing primary jurisdiction: "(1) whether the agency determination

---

Supp. 2d at 114 (staying a case and referring it to OSHA for administrative proceedings on a highly technical OSHA issue).

[   ] MIT also argues that stay or dismissal of this civil rights case is appropriate merely because rulemaking is underway, but cites no Title III cases. *See* MTD at 9-10. This contention ignores the purpose of the primary jurisdiction doctrine, which is to refer cases to administrative agencies for a decision rather than to warehouse a case. It also flies in the face of the on-point contrary ruling in the *Harkins* ruling and Statements of Interest in *Netflix* and *Harkins* from the very agency to which referral is sought. *See supra* at 10-11. Whatever the practice in other areas of law involving other kinds of issues and other kinds of administrative proceedings, the law is clear under Title III.

[15] MIT suggests that the policy issues that the proposed Title III rulemaking will address for all public accommodations will also be helpful because of inconsistent court decisions. *See* MTD at 11, 16. The court in *Netflix* did not reach this issue. While there is a dispute whether the Internet is a public accommodation outside this Circuit, that dispute is not germane to this case because Plaintiffs have not asserted that MIT's Online Content is a public accommodation. *See infra* at 27-28. Rather, Plaintiffs assert that MIT itself is a public accommodation covered by Title III. There is no inter-circuit split that Title III covers the online activity or program of a university or other physical public accommodation. *See infra* at 28 and n.31.

[16] Primary jurisdiction "does not require that all claims within an agency's purview be decided by the agency." *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002).

lies at the heart of the task assigned the agency by Congress; (2) whether agency expertise is required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court." *Rymes Heating Oils, Inc. v. Springfield Terminal Ry. Co.*, 358 F.3d 82, 91 (1st Cir. 2004) (citation omitted). In addition, courts also consider the harm of delay. *See Am. Auto. Mfrs. Ass'n*, 163 F.3d at 81-82; *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575 (1st Cir. 1979) (stay inappropriate because of the "strong public interest in the prompt resolution of the case" instead of "an administrative action of uncertain aid and uncertain speed").[17]

*First*, the Court's determination of this case does not "lie[] at the heart of the task" assigned by Congress to DOJ. *See* MTD at 10. Congress gave DOJ no adjudicatory authority to dispose of this case. In particular, DOJ cannot adjudicate undue burden and other affirmative defenses particular to MIT. *See supra* at 11; *Harkins*, DOJ Statement of Interest, ECF No. 75 at pp. 5-6.

*Second*, the Court need not "unravel intricate, technical facts." MIT has asserted none and there is no factual record of intricate, technical issues. *See Palmer Foundry*, 319 F. Supp. 2d at 113-14; *P.R. Tel. Co. v. WorldNet Telecomm. Inc.*, 52 F. Supp. 3d 370, 381 (D.P.R. 2014) ("Courts need not refer to administrative agencies when the question presented simply requires [them] to engage in an activity – statutory interpretation – that is the daily fare of federal judges.") (citation omitted), *appeal filed* Oct. 30, 2014.

Invoking primary jurisdiction is particularly inappropriate, as noted above, where DOJ

---

[17] In applying these factors, courts invoke the doctrine "sparingly." *U.S. Pub. Interest Grp. v. Atl. Salmon of Maine, LLC*, 339 F.3d 23, 34 (1st Cir. 2003*); see also Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334, 340 n.5 (1st Cir. 1970) (doctrine "should seldom be invoked"); *Palmer Foundry, Inc. v. Delta-HA, Inc.,* 319 F. Supp. 2d 110, 112-14 (D. Mass. 2004) (issuing a "rare" stay in case involving highly technical OSHA issue).

has already clearly enunciated its position that Title III requires captioning as an auxiliary aid. *See infra* at 3-4, 10-11; *see also Locust Cartage Co.*, 430 F.2d at 340 n.5; *TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 74 (2d Cir. 2002) (stay or dismissal inappropriate where the agency is willing to weigh in on the relevant issues which "can serve much of the interest in consistency and uniformity of law that underlies the doctrine of primary jurisdiction, while avoiding some of the delay that sometimes results from dismissing on the ground of primary jurisdiction").

*Third*, regarding whether an administrative determination would materially aid the Court, *Harkins* and DOJ make clear that DOJ can make no such a determination. *See supra* at 10-11.[18]

*Fourth*, waiting until DOJ issues final regulations at some indefinite future time will cause prejudice to Plaintiffs and the class who continue to be denied access to MIT's Online Content solely because of their disability. The timeline for the DOJ rulemaking process is highly uncertain. *See supra* at 3 and n.8. Nor does it makes sense to stay or dismiss this enforcement action when the DOJ and ED themselves have brought enforcement actions against other universities and covered entities to obtain closed captioning without waiting for the completion of the proposed rulemaking. *See supra* at 3 and n.10, *infra* at 22-23.

      **iv.**        **The Court May Obtain the Expertise of DOJ Through Statements of Interest Without the Delay of a Stay or Dismissal.**

Last, the Court need not stay or dismiss this case in order to obtain the benefit of DOJ's

_____

[18] In *Netflix, supra*, the Court initially stayed the case for three months to permit the FCC to issue its final regulations under the CVAA concerning the captioning of television programming. No. 11-CV-30168-MAP, ECF No. 32. After the final regulations were issued, defendant filed a motion for judgment on the pleadings, which the Court denied. 869 F. Supp. 2d 196, 200-01 (D. Mass. 2012). The Court found that there was no irreconcilable conflict between Title III and the CVAA and that the CVAA did not limit plaintiff's Title III claims. *Id.* at 208 ("[T]he CVAA does not cover all of the streaming video programming and other services that are the subject of Plaintiffs' ADA claim."). Here, neither the CVAA, FCC rulemaking, nor final regulations are at issue. Instead, the very agency to which referral is sought, DOJ, believes stay or dismissal is unwarranted and its views on captioning are available to the Court.

views on captioning. An agency's views can be expressed not only in rulemaking, but in legal briefs, such as a DOJ Statement of Interest that interpret the statute and regulations. DOJ, for example, submitted such Statements in *Netflix* to assist the Court in resolving that case. *See supra* at 3-4. In addition to reviewing DOJ Statements filed in other cases, the Court can review the Statement of Interest that DOJ has stated it intends to submit without the delay and prejudice that a stay or dismissal would cause to Plaintiffs and the class.

      **B.**      **Plaintiffs Have Stated a Claim Under the Rehabilitation Act.**

      The Rehabilitation Act of 1973 is a landmark civil rights law, passed by Congress "to ensure that members of the disabled community could live independently and fully participate in society." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259 (D.C. Cir. 2008). One of the Act's explicit policies is "equal access," which, according to the statutory language, includes "the use of accessible formats." 29 U.S.C. § 701(c)(2). Consistent with its comprehensive purpose, the Act prohibits colleges and universities who receive federal funds from denying their benefits, excluding from participation, or otherwise engaging in discrimination on the basis of disability in "*all of the operations*" of colleges and universities. 29 U.S.C. § 794(b) (emphasis added). Likewise, regulations promulgated by ED broadly prohibit universities from, for example, providing people with disabilities with benefits that are unequal to or less effective than benefits provided to nondisabled people, or from otherwise limiting enjoyment of their benefits on the basis of disability. *See, e.g.*, 34 C.F.R. §104.4(b)(1).

      Notwithstanding the comprehensive scope of these protections, MIT declines to make available the vast majority of its Online Content in a format accessible to people who are deaf or hard of hearing, thus denying them the privileges and advantages it provides to all other members of the general public.

      To prevail on its motion, MIT faces the extraordinary burden of demonstrating that its

15

failure to provide any access to people who are deaf or hard of hearing to most of its Online

Content is consistent as a matter of law with the broad terms of the Rehabilitation Act and its

regulations. Indeed, MIT can only prevail if it can show that its Online Content as a matter of

law is categorically exempt from the Rehabilitation Act, something it cannot do for several

reasons.

*First*, there is simply no interpretation of the plain language of the Rehabilitation Act that

permits MIT to make its Online Content available to the general public, but to deny the vast

majority of that content to people who are deaf or hard of hearing. *Second*, MIT's "caption

virtually nothing" approach cannot be reconciled with the implementing regulations promulgated

by ED which require universities to ensure access as a general matter. This conclusion is

reinforced by ED's interpretation of its own regulations to require that covered entities make

their websites accessible, and that this obligation is owed not only to students but also to

members of the general public who wish to participate in the programs and benefits of the

entities. ED has enforced those regulations to require captioning of online content. *Third*, MIT's

argument that it can continue to deny the vast majority of its Online Content to deaf and hard of

hearing people simply because the regulations do not specifically address such content must be

rejected as contrary to established law.

### i.      Plaintiffs Have Properly Alleged the Elements of a Claim Under the Rehabilitation Act.

To show a violation, Plaintiffs must allege that (1) they are disabled "within the meaning

of the [Rehabilitation Act]; (2) [they are] otherwise qualified for the benefit or services sought;

(3) [they were] denied the benefit or services solely by reason of her handicap; and (4) the

program providing the benefit or services receives federal financial assistance." *Lovell v.

Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). Plaintiffs have met this standard: they have

alleged that they are deaf or hard of hearing, they are qualified to participate in MIT's Online

Content, they are denied access to it solely because they are deaf or heard of hearing, and MIT

receives federal financial assistance. *See* Compl. ¶¶ 14, 20-23, 25, 28, 32-41, 95, 98-100.

> **ii.      MIT's Refusal to Provide Deaf and Hard of Hearing Persons Access to the Vast Majority of its Online Content Violates the Rehabilitation Act and ED Implementing Regulations.**

MIT has not disputed that its Online Content is available to the general public, or that it

denies most of this content to members of the general public who are deaf or hard of hearing. *See*

MTD at 3-4.[19] The clear terms of the Rehabilitation Act and its regulations, and ED's

interpretation of the statute and regulations, demonstrate that MIT is violating the Act.

> **a.      The Plain Language of the Rehabilitation Act Prohibits MIT's "Caption Virtually Nothing" Approach.**

The starting point of statutory interpretation is the plain language of the statute. *See Ruiz*

*v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 8-9 (1st Cir. 2007). Here, the Rehabilitation

Act broadly prohibits excluding deaf and hard of hearing individuals from participation in

programs or activities, denying benefits or subjecting such individuals to discrimination in "*all of*

*the operations of . . .* a college, university, or other postsecondary institution." 29 U.S.C. §§

794(a), 794(b)(2)(A) (emphasis added). Congress intended this definition to be comprehensive: it

was enacted as part of the Civil Rights Restoration Act of 1987, Pub. L. No. 100–259, 102 Stat.

---

[19] MIT claims that many videos on the OCW Platform are accessible, and that it will commit to make all future videos on that Platform accessible. MTD at 1, 5-6. This is a factual assertion not appropriate for resolution on a motion to dismiss. *See supra* at 7-8. But even if true, the vast majority of videos posted on MIT's other Platforms remain uncaptioned and inaccessible. Compl. ¶¶ 28-63.

Although MIT suggests that in theory, rolling transcripts might be an alternative to captioning as a means of making its Online Content accessible to people who are deaf or hard of hearing, it is not actually providing such transcripts on all of its Online Content. This would be, in any event, another question of fact inappropriate to resolve on a motion to dismiss without a factual record.

28 (1988), in which Congress expressly reversed Supreme Court cases limiting the scope of the Act to the specific program or activity receiving the federal funds. *See DeVargas v. Mason & Hanger-Silas Mason Co.*, 911 F.2d 1377, 1383-84 (10th Cir. 1990) (discussing legislative history).[20]

Further, none of MIT's cited cases supports the proposition that MIT's Online Content is categorically exempt from the Rehabilitation Act as a matter of law. At best, these cases – none of which concern online content – establish that in some instances, a court must balance various interests in applying the requirements of the Act.[21] To the extent that such a balance may be appropriate here, that is not a basis for dismissal at this stage. To the contrary, it points out the need for factual development in order for the Court to decide on a complete factual record whether any such balancing is appropriate and how to balance the various interests.

> **b.     ED Regulations Prohibit MIT from Failing to Caption Nearly All of its Online Content.**

ED regulations, found at 34 C.F.R. Part 104, implement and interpret the Rehabilitation Act. Part 104 is divided into several subparts, each addressing different topics, and each including prohibitions against discrimination relevant to that topic. In particular, subpart A includes section 104.4 (General Prohibitions), which contains a number of requirements applicable to all programs and activities of colleges and universities. Plaintiffs' claims are based on this regulation (and the statutory text on which it is based).

---

[20] Based on this language, courts have construed the reach of the Rehabilitation Act broadly. *See, e.g.*, *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998) (construing the Rehabilitation Act and Title II of the ADA to apply to everything that a covered entity does); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076-1077 (9th Cir. 2002) (same).

[21] *See, e.g.*, MTD at 18. MIT does not allege, nor could it, that providing captions to allow equal access for deaf and hard of hearing individuals would compromise academic standards. *See id.* Any balancing is a fact intensive inquiry. The means to resolve this is after discovery, when the Court can evaluate MIT's affirmative defenses—undue burden and fundamental alteration.

Plaintiffs' complaint contains a number of allegations that track various requirements of section 104.4. For example, Plaintiffs allege that by captioning virtually nothing within its extensive online educational services, MIT has:

- Denied opportunities for deaf and hard of hearing people to participate in or benefit from its aids, benefits, or services. Compl. ¶ 97; *see* 34 C.F.R. § 104.4(b)(1)(i).

- Afforded deaf and hard of hearing people opportunities to participate or benefit from its aids, benefits and services that are not equal to, or effective as, those afforded others. Compl. ¶ 97; *see* 34 C.F.R. § 104.4(b)(1)(ii)-(iii).

- Limited deaf or hard of hearing people in the enjoyment of rights, privileges, advantages, and/or opportunities enjoyed by others receiving MIT's aids, benefits, or services. Compl. ¶ 97; *see* 34 C.F.R. § 104.4(b)(1)(vii).

- Utilized methods of administration (i) that have the effect of subjecting deaf or hard of hearing persons to discrimination on the basis of handicap, and (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of MIT's programs and activities with respect to deaf and hard of hearing persons. Compl. ¶ 97; *see* 34 C.F.R. § 104.4(b)(4).

These allegations are supported by factual claims concerning MIT's Online Platforms. *See supra* at 6.

ED – whose interpretation of its own regulations is entitled to substantial deference[22] – has repeatedly affirmed its view that the General Prohibitions in the regulations require that websites and other emerging technologies be accessible to people with disabilities. In 2010, ED

_____

[22] *See, e.g., Talk Am., Inc. v. Michigan Bell Tel. Co.*, 131 S. Ct. 2254, 2260-61, 2263 (2011); *Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 145-46 (1st Cir. 2007).

and DOJ jointly issued a Dear Colleague Letter ("DCL") expressing their concern over use of inaccessible technology by colleges and universities.[23] The DCL emphasized, "*the general requirements* of Section 504 . . . reach equipment and technological devices when they are used by" covered entities "as part of their programs, services, activities, goods, advantages, privileges, or accommodations." *Id.* (emphasis added); *see* Compl. ¶ 81. ED specifically cited the general prohibitions in section 104.4 as a basis for these conclusions. DCL at 2 nn.3-5 (citing, *inter alia*, 34 C.F.R. § 104.4(b)(1)(ii)-(iv)).

MIT argues that the DCL is irrelevant here because it concerns the accessibility of devices, rather than the accessibility of online content. MTD at 26. This misses the point. The DCL demonstrates that the General Prohibitions apply to emerging technologies, notwithstanding that the regulations do not explicitly identify each type of emerging technology. The ED made this point in a subsequent "Frequently Asked Questions" about the DCL. The FAQ reaffirmed a number of important principles, including:

- the DCL did not "impose new legal obligations," but rather "discuss[d] long-standing law," "key principles of Federal disability discrimination law," and "long-standing requirements";

- "[A]ll school programs or activities – whether in a "brick and mortar," online, or other "virtual" context – must be operated in a manner that complies with Federal disability discrimination laws";

- because all school operations are subject to nondiscrimination requirements of Section 504, all faculty and staff must comply with these requirements; and

---

[23] U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter (June 29, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100629.pdf (last visited June 22, 2015) at p. 1.

- the principles of the DCL apply to other emerging technologies, *including "online programs that are . . . provided by the school directly or through contractual or other arrangements."*[24]

As it must, MIT concedes that ED interprets the General Prohibitions to apply to online content. *See* MTD at 26. MIT attempts to evade its captioning obligations by relying on FAQ No. 12, which states that "traditional alternative media" can be an accommodation in lieu of emerging technologies if that media provides access in an equally effective and equally integrated manner. *See* DCL FAQ, at p. 7. However, MIT cannot hide behind its potential to provide "traditional alternative media" when it does not actually provide such services. Further, even if MIT provided "traditional alternative media," it would be a question of fact whether that alternative access is as effective and integrated as captioning. It is hard to imagine anything other than captions to make the aural content of thousands of online offerings accessible to individuals who cannot hear. In any case, this presents a material issue requiring fact-sensitive evaluations not appropriate on a motion to dismiss. *See supra* at 7-8.[25]

---

[24] U.S. Dep't of Educ., Frequently Asked Questions about the June 29, 2010, Dear Colleague Letter (May 26, 2011), http://www2.ed.gov/about/offices/list/ocr/docs/dcl-ebook-faq-201105.pdf (last viewed June 22, 2015) ("DCL FAQ"), at pp. 1, 4. Further, MIT has been on notice since the 1990s that the Rehabilitation Act and the ADA apply to its websites, *see supra* at 3, n.10 and that Rehabilitation Act and ADA compliance requires captioning of aural materials. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35544, 35566 (July 26, 1991).

[25] MIT also relies on a statement from the ED that a university's obligation to its students does not include maintaining a complete Braille library. MTD at 22. As discussed in the Title III section, *supra*, this example is not analogous to the provision of captions on online content.

There are many procedures and policies that a university could have in place to ensure that its disabled students are not denied, or provided unequal, advantages of its libraries, short of maintaining a complete Braille library. The advantages of a university library are very different from those of videos posted on the Internet, in which immediate access is a key characteristic. Likewise, the burden of adding captions online does not compare to the publication of Braille books. Thus MIT's analogy of a university library to the World Wide Web mixes apples and

In addition, ED has enforced the comprehensive terms of the Rehabilitation Act and its section 104.4 regulations to require that universities caption their online content even without specific closed captioning regulations and waiting for DOJ's proposed Title III website regulations. *See, e.g.*, Youngstown State Univ. Resolution Agreement, Office of Civil Rights Compliance Review #15-13-6002 (Nov. 24, 2014), *available at* http://www2.ed.gov/documents/press-releases/youngstown-state-university-agreement.pdf ("Youngstown State University Agreement") (addressing accessibility violations under Rehabilitation Act, section 104.4 regulations and ADA Title II); Univ. of Cincinnati Resolution Agreement, Office of Civil Rights Compliance Review #15-13-6001 (Dec. 8, 2014), *available at* http://www2.ed.gov/documents/press-releases/university-cincinnati-agreement.pdf (same). In both cases, the ED determined that the universities' websites displayed inaccessible content or had captions that were incomplete, inaccurate, or lacked complete audio descriptions. Letter from Meena Morey Chandra, Director of U.S. Dept. of Ed. Office for Civil Rights, Region XV, to James P. Tressel, President of Youngstown State University (Dec. 12, 2014), *available at* http://www2.ed.gov/documents/press-releases/youngstown-state-university-letter.pdf, at 13 ("Youngstown State University OCR Resolution Letter"); Letter from Ms. Chandra to Santa J. Ono, President of the University of Cincinnati (Dec. 14, 2014), *available at* http://www2.ed.gov/documents/press-releases/university-cincinnati-letter.pdf, at 9-10 ("University of Cincinnati OCR Resolution Letter").

As part of its settlement agreement with ED, the University of Cincinnati agreed to "review its website and e-learning platform(s) to identify and ameliorate any accessibility

---

oranges. Finally, the scope of MIT's obligation to make its Online Content accessible requires an analysis of a number of facts not appropriate on a motion to dismiss. *See infra* at 31-34.

problems." University of Cincinnati OCR Resolution Letter, at 12. Youngstown did as well. *See*

Youngstown State University Agreement, § (B)(5) (requiring University Staff to "review their

assigned web courses and course management page(s)/portal(s) . . . for accessibility, including

. . . a reporting mechanism to identify concerns and revisions, and a timeline by which revisions

must be completed."); *see also* University of Montana Resolution Agreement, § (III) (J),

*available at* http://www.umt.edu/accessibility/docs/FinalResolutionAgreement.pdf (requiring

that "By December 31, 2014, all webpages published or hosted by the University on or after July

30, 2013, shall be accessible according to WCAG 2.0 Level AA standard," which includes the

provision of closed captions on pre-recorded videos).

      Thus, MIT's constricted interpretation of the Rehabilitation Act and the implementing

regulations finds no support in either ED's guidance or enforcement actions.

      **c.**    **That ED Regulations Do Not Specifically Address the
Accessibility of Online Content Does Not Excuse MIT from
Complying with the Rehabilitation Act and the General
Provisions Regulations.**

      The Court should reject MIT's argument that it has no obligation to make content

accessible because ED regulations do not specifically address online content. The comprehensive

reach of the General Provisions regulations reflects the broad prohibition of discrimination in

"*all of the operations*" of colleges and universities. 29 U.S.C. § 794(b) (emphases added). *See*

*supra* at 2, 17-18.

      This issue was also specifically addressed in *Fortyune v. City of Lomita*, 766 F.3d 1098

(9th Cir. 2014), *petition for certiori filed*, 766 F.3d 1098 (Jan. 30, 2015), one of a line of cases in

which courts have enforced general provisions of disability access regulations in the absence of

specific regulations. "The City argued that, absent the adoption of ADA implementing

regulations specifically targeted toward on-street parking, it is not required to provide accessible

on-street parking." *Id.* at 1100. The Ninth Circuit rejected that argument, holding that, even

absent a regulation directly on point, the city was obligated to provide accessible on-street

parking. *Id.* at 1102. The court relied on the "text of the ADA, the relevant implementing

regulations, and the DOJ's interpretation of its own regulations," including "a publicly available

supplement to the [Technical Assistance] Manual, that public entities have a general obligation

to ensure that governmental services are reasonably accessible even when no technical

specifications exist for a particular type of facility." *Id.* at 1106. In terms of the statute and

regulations, the court noted "the broad reach of the ADA," including its general requirements

that existing facilities be made accessible in their entirety and each new facility be accessible. *Id.*

at 1102-03 (citing 28 C.F.R. §§ 35.150(a), 35.151). The Court observed that nothing in the

regulations "suggests that when technical specifications do not exist for a particular type of

facility, public entities have no accessibility obligations." *Id.* at 1103.[26]

    In *Netflix*, the court recognized that "the legislative history of the ADA makes clear that

Congress intended the ADA to adapt to changes in technology." 869 F. Supp. 2d at 200-01.[27]

---

[26] Numerous other cases have followed this approach. *See, e.g.*, *Coppi v. City of Dana Point*, No. SACV 11-1813 JGB, 2015 WL 757241, at *5 (C.D. Cal. Feb. 23, 2015) ("[E]ven in the absence of a specific regulation, public entities must still provide reasonable access to public facilities under the ADA," such as the outdoor beach trail portions at issue); *Hammond v. City of Red Bluff*, No. 2:14-CV-01136-TLN, 2014 WL 6612059, at *3-4 (E.D. Cal. Nov. 20, 2014) (determining that lack of specific regulations in ADA, Section 504, and state law did not foreclose on-street parking claim); *Access Now, Inc. v. Holland Am. Line-Westours, Inc.*, 147 F. Supp. 2d 1311, 1312-13 & n.4 (S.D. Fla. 2001) (determining that "the ADA . . . contemplates access actions even in the absence of specific regulations" and ordering suit to go forward even before long-awaited DOJ regulations on cruise ships).

[27] MIT cites two cases in which the defendants complied with specific regulations, and the courts refused to order those defendants to take additional actions. In *Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority*, 718 F.2d 490, 494 (1st Cir. 1983), the Department of Transportation issued a regulation and explanatory documents stating that if a covered entity spent an average of 3.5% of certain designated funds on programs for the transportation of wheelchair users, it would be in compliance with the regulation. The defendant had spent this amount of money, and the court refused to order it to spend additional

24

#### d.      MIT's Arguments Regarding "Facilities" and "Post-Secondary" Regulations Are Unavailing.

Most of the Rehabilitation Act portion of MIT's brief is devoted to addressing two regulations on which Plaintiffs' Complaint does not rely.[28] They are red herrings.

*First*, MIT argues that Plaintiffs' claims are not supported by regulations governing access to facilities. MTD at 20-21. "Facilities" are defined as buildings and other "real or personal property." *See* 34 C.F.R. § 104.3. Plaintiffs do not contend that MIT is obligated to caption its online content based on ED regulations governing facilities access.

*Second*, MIT argues that it is not obligated to caption its public online content under subpart E, which concerns its obligations to its students with respect to the following areas: admissions and recruitment; treatment of students; academic adjustment; housing; financial and employment assistance to students; and nonacademic services for students, such as athletics,

money. *Id.* at 497. In *George v. Bay Area Rapid Transit*, 577 F.3d 1005 (9th Cir. 2009), DOT regulations expressly created a safe harbor provision for facilities constructed in compliance with ADA statutory specifications before the DOT promulgated regulations. The regulations in this case contain no such safe harbor provision for non-facility issues, such as entities that should provide auxiliary aids and services.

In both of these cases, the defendants indisputably complied with clear-cut regulations, and the courts refused to order them to take additional actions not required by those regulations. Here, to the contrary, ED regulations require MIT to make its Online Content accessible. MIT has not come close to doing so. Plaintiffs do not seek an order requiring MIT to go beyond the requirements of the regulations, but rather simply to comply with those regulations and the text of the Rehabilitation Act.

[28] MIT also suggests that it need not provide captioning as an accommodation or auxiliary aid until it receives a request to do so. MIT has long known that "[c]losed captions make videos accessible to those who are deaf or hard of hearing" and NAD requested captioning before this action. Compl. ¶¶ 3, 8, 79-86. On a motion to dismiss, the Court treats these claims as true. *See supra* at 7-8. Numerous courts have held that a covered entity that knows of a need for an accommodation – such as MIT's knowledge that steps are necessary to make its Online Content accessible to members of the public who are deaf or hard of hearing – has an obligation to provide that accommodation. *See, e.g.*, *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196-98 (10th Cir. 2007). Finally, Plaintiffs have asserted a number of claims not based on the reasonable accommodation or auxiliary requirements, including that by failing to automatically make its Online Content accessible, MIT is denying deaf and hard of hearing people the benefits of that Online Content, or providing an unequal benefit.

counseling and social organizations. MTD at 21. While Plaintiffs do not have to rely on Subpart E, Subpart E in no way contradicts, and in fact, supports Plaintiffs' claims. ED has made clear specific responsibilities of postsecondary institutions to provide auxiliary aids and services to nonmatriculating students and in any programs offered by educational institutions to the public.

The obligations of a university extend beyond students to include members of the general public. In a November 2014 FAQ, ED specifically stated that the Rehabilitation Act "applies to individuals with disabilities who are not students, such as . . . members of the public seeking information from, or access to, the services, programs, and activities of the public school." U.S. Dep't of Justice and U.S. Dep't of Educ., Frequently Asked Questions on Effective Communication for Students with Hearing, Vision, or Speech Disabilities in Public Elementary and Secondary Schools (Nov. 2014), http://www2.ed.gov/about/offices/list/ocr/docs/dcl-faqs-effective-communication-201411.pdf, at pp. 2, 13 ( last visited June 23, 2015).[29] Similarly, ED has found that postsecondary institutions must provide auxiliary aids and services to nondegree students with disabilities, such as those who are auditing classes or otherwise not working for a degree. U.S. Dep't of Educ., Auxiliary Aids and Services for Postsecondary Students with Disabilities, http://www2.ed.gov/about/offices/list/ocr/docs/auxaids.html (last visited June 23, 2015).

### C.    Plaintiffs Have Stated a Claim That MIT's Failure to Caption its Online Video Content Violates Title III of the Americans with Disabilities Act.

Although Plaintiffs have properly alleged all the elements of a Title III claim, MIT attempts to re-write Plaintiffs' claims or carve out an exception for its Online Content. MIT also

---

[29] Although the FAQ specifically addresses the obligations of public elementary and secondary schools under these statutes, the conclusions reached in the document are based on generally applicable requirements of the Rehabilitation Act discussed by the ED in the introductory paragraphs of the FAQ.

prematurely asks the Court to resolve affirmative defenses which cannot be decided on a motion to dismiss.

i.  **Plaintiffs Have Properly Alleged the Elements of a Claim Under Title III.**

Consistent with the ADA's "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), Title III directs that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a); *see* 42 U.S.C. 12101(a)(3); *see also* 28 C.F.R. § 36.201(a) (parallel regulations). Thus, to state a claim under Title III, plaintiffs must allege: (1) that they are disabled within the meaning of the ADA, (2) that the defendant owns, leases, or operates a place of public accommodation, and (3) that the defendant discriminated against them by denying them a full and equal opportunity to enjoy the services the defendant provides. *See Jacobs*, 2014 WL 7330762, at *4. Plaintiffs have pleaded all of these elements so dismissal is therefore unwarranted. *See supra* at 2.

ii.  **Plaintiffs Have Properly Alleged That MIT, as an Undergraduate, Postgraduate Private School or Other Place of Education, Is a Place of Public Accommodation.**

MIT does not dispute Plaintiffs' allegation that MIT owns and operates an "undergraduate, or postgraduate private school, or other place of education," a place of public accommodation. 42 U.S.C. § 12181(7)-(J); Compl. ¶¶ 27, 103; *see* MTD at 27-34 (not contesting allegations). While it is unclear why MIT is confused about this claim given Plaintiffs' unambiguous allegations, MIT appears to be attempting to convert this case into one alleging that the website itself is the public accommodation at issue. MTD at 29. Although websites are

covered entities under Title III,[30] this case does not involve discrimination by a public

accommodation that exists solely online, as was the case in *Netflix*, 869 F. Supp. 2d at 200 (video

streaming company) or one that provides goods and services without a physical structure, as was

the case in *Carparts Distribution Center v. Automotive Wholesaler's Association*, 37 F.3d 12, 14,

19-20 (1st Cir. 1994) (insurance company selling policies by telephone). Rather, Plaintiffs claim

that MIT, as an undergraduate and postgraduate private school, is a public accommodation, and

that its Online Platforms are benefits, services, or privileges. Even in Circuits that require public

accommodations to have a nexus to a physical place, MIT's provision of Online Content is

covered by Title III. MTD at 28; *see, e.g.*, *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d

1104, 1114 (9th Cir. 2000).[31]

The Court should reject MIT's attempt to obscure the clearly-stated Title III claim – that

MIT, a public accommodation, has discriminated against deaf and hard of hearing individuals in

the enjoyment of its Online Content by refusing to provide auxiliary aids and services. These

---

[30] The First Circuit, Seventh Circuit, and district courts in Second and Eighth circuits have held that public accommodations are not limited to physical places. *See, e.g.*, *Tompkins v. United Health Care of New England*, 203 F.3d 90, 95 n.4 (1st Cir. 2000); *Netflix*, 869 F. Supp. 2d at 200-02; *Morgan v. Joint Admin. Bd., Ret. Plan of the Pillsbury Co.*, 268 F.3d 456, 459 (7th Cir. 2001) ("The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services. What matters is that the good or service be offered to the public."); *Doe v. Mutual Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (websites are public accommodations under Title III); *Nat'l Fed'n of the Blind v. Scribd, Inc.*, No. 2:14-CV-162, 2015 WL 1263336, at *10 (D. Vt. Mar. 19, 2015) (same); *Winslow v. IDS Life Ins. Co.*, 29 F. Supp. 2d 557, 563 (D. Minn. 1998).

[31] There is a nexus between MIT's brick and mortar institution and its service—the online videos available on MIT's platforms—even though those services are provided on the internet and not on MIT's premises. *See Netflix*, 869 F. Supp. 2d at 201 (the ADA covers "the services 'of' a public accommodation, not services 'at' or 'in' a public accommodation"); *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 953 (N.D. Cal. 2006) (referencing *Weyer*, and noting that the ADA "applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute") (emphasis in original) (citation omitted).

allegations are entitled the presumption of truth on this motion. *See supra* at 7.

> ### iii. Plaintiffs Have Stated a Claim that MIT Denies Them the Full and Equal Opportunity to Enjoy MIT's Online Content by Failing to Provide the Auxiliary Aid of Accurate Closed Captioning.

Discrimination by public accommodations under Title III includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals *because of the absence of auxiliary aids and services . . . .* " 42 U.S.C. § 12182(b)(2)(A)(iii) (emphasis added); *see also* 28 C.F.R. § 36.303(a); Compl. ¶¶ 104-105. A public accommodation, such as MIT, "*shall* furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1) (emphasis added). Effective communication means "communication with persons with disabilities that is *as effective as communication with [non-disabled individuals].*" Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35544, 35566 (July 26, 1991) (emphasis added); 28 C.F.R. § 36.303(c)(1)(ii); *see, e.g.*, *Majocha v. Turner*, 166 F. Supp. 2d 316, 323 (W.D. Pa. 2001).

Closed captions, as noted above, are an established auxiliary aid and service, and provide an "effective method[] of making aurally delivered information[32] available to individuals who are deaf or hard of hearing." 28 C.F.R. § 36.303(b)(1); *see* 42 U.S.C. § 12103(1)(A). Congress recently enacted the CVAA to specify captions as the means of making aural content accessible. *See* 47 U.S.C. § 613(c)(2)(A); *see* 47 C.F.R. § 79.4. Indeed, MIT has acknowledged that closed captions "make videos accessible to those who are deaf or hard of hearing." Compl. ¶ 3, n.3.

---

[32] Aurally-delivered materials include nonverbal sounds and alarms and computer-generated speech. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35544, 35566 (July 26, 1991).

There can be no question that Plaintiffs have properly asserted that MIT's current

practice of failing to provide closed captions, or any auxiliary aid, on many of its online videos

denies Plaintiffs access to MIT's Online Content that is as equal as possible to the access of other

members of the public. *Id.* ¶ 105; *see Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 709

(D. Md. 2008) (without "some form of auxiliary aid or service, Plaintiffs would not have equal

access" to the aural information provided by the owner of a football stadium).

> ### a.    MIT Does Not Assert That its Online Offerings Are Equally Available to Individuals Who Are Deaf and Hard of Hearing by the Use of Auxiliary Aids and Services Other than Captions.

Unable to argue that closed captioning is not required under Title III as a matter of law,

MIT makes a straw man argument that mandating closed captioning for its online videos

deprives MIT of the flexibility to choose an appropriate auxiliary aid under Title III. *See* MTD at

32-33; 42 U.S.C. § 12182(b)(2)(A)(iii); *Harkins*, 603 F.3d 666, 675 (9th Cir. 2010) (reversing

district court holding that closed captioning movie equipment is not required under the ADA).

However, as noted above, *see supra* at 17, MIT does not contend that Plaintiffs can access the

aural content in its online videos or that MIT identified and provided Plaintiffs an alternative

auxiliary aid. Nor has MIT questioned Plaintiffs' allegations that much of MIT's online videos

lack closed captions altogether or that many captions are inaccurate or unintelligible, rendering

the videos inaccessible for individuals who are deaf or hard of hearing. *See, e.g.*, Compl. ¶¶ 32-

38, 40, 42-63; *see* 28 C.F.R. Part 36, Appendix C, Subpart C (persons with disabilities should not

be denied services "because of the use of . . . ineffective auxiliary aids").

Even if MIT had proffered alternative auxiliary aids or services that purportedly results in

effective communication, it would merely have raised a question of fact that is inappropriate to

consider at the motion to dismiss stage. *See, e.g.*, *Innes v. Bd. of Regents of Univ. Sys. of Md.*, 29

F. Supp. 3d 566, 581 (D. Md. 2014); *see supra* at 7-8.[33] MIT acknowledges that determining whether closed captions or alternative auxiliary aids ensure effective communication is a fact-specific inquiry. MTD at 32. Fact-intensive inquiries are an inappropriate basis upon which to dismiss an action. *See supra* at 8. Each of the cases cited by MIT in support of its argument for flexibility in determining an appropriate accommodation involves accommodation assessments based on a developed factual record. MTD at 32 (*citing Dudley*, 333 F.3d at 310 (affirming a judgment assessing the reasonableness of policy for accommodation); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (holding expert testimony on whether auxiliary aid resulted in effective communication was an impermissible legal opinion)). There is no developed factual record here, and since Plaintiffs have set forth a legally sufficient claim that MIT's online videos are inaccessible, they have stated a sufficient claim for relief under Title III.

### b. The Narrow Inventory Exception Does Not Apply Because Captioning Is an Auxiliary Aid, Not a Separate "Good."

MIT argues that Title III's narrow inventory exception protects it from "alter[ing] its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities" under 28 C.F.R. § 36.307(a)–(c). *See* MTD at 33. This exception is completely inapplicable to this where MIT is providing the *service* of streaming its Online Content, and closed captions are simply the auxiliary aid required for deaf and hard of hearing people to access this service. *See Netflix*, 869 F. Supp. 2d at 200-02 (streaming video

---

[33] The court in *Target* similarly determined that the proper auxiliary aid required for people who were blind or visually impaired to access defendant Target's website was an affirmative defense that could not be resolved in a motion to dismiss. *See* 452 F. Supp. 2d at 956. Once Plaintiffs have stated a claim by alleging that MIT's online videos are inaccessible, the burden shifts to MIT to assert an affirmative defense, such as that the information will be provided in another reasonable format. *See id.*

programming is a service). Characterizing captions as providing a separate and different good is contrary to the statute, regulations, DOJ interpretations, and common sense.

Cases addressing the "inventory exception" support Plaintiffs' view. In *Harkins*, the Ninth Circuit rejected a movie theater defendant's argument that providing equipment to display closed captions on movies would fundamentally alter the content of its services. The "movie theaters' primary *service* is to screen films." 603 F.3d at 674 (emphasis added). Rather than changing the service provided, the Court determined that Plaintiffs were "seeking an auxiliary aid, which is specifically mandated by the ADA to prevent discrimination of the disabled." *Id.* at 672. By "its very definition, an auxiliary aid or service is *an additional and different service* that establishments must offer the disabled." *Id.* (emphasis added). The court in *Ball v. AMC Entertainment, Inc.*, 246 F. Supp. 2d 17 (D.D.C. 2003), likewise rejected the movie theater defendants' argument that it was not required to show movies with closed captioning by comparing themselves "to video stores that must allow deaf patrons to check out videotapes but are not required to stock captioned videos," stating that the defendants provided "the *service* of screening first run movies." *Id.* at 24 (emphasis in original).

Similar to *Harkins* and *Ball*, MIT is providing a service to the public – streaming of its Online Content. Closed captioning would not alter the nature of MIT's online video services. Accepting MIT's argument that providing captioning for its online video services constitutes an improper alteration of inventory would "effectively eliminate[] the duty of a public accommodation to provide auxiliary aids and services." *See Harkins*, 603 F.3d at 672.

The cases that MIT cites, which concern limitations of insurance policy coverage, are not germane. *See* MTD at 34-35 (citing *Karczewski v. K Motors, Inc.*, No. 14CV2701-MMA, 2015 WL 1470651 (S.D. Cal. Mar. 21, 2015); *McNeil v. Times Ins. Co.*, 205 F.3d 179, 188 (5th Cir.

2000); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d at 559-60). None of those cases addressed the relevant issue here – whether defendants were required to provide plaintiffs with an auxiliary aid or service to assist them in accessing defendants' goods or services. As the Ninth Circuit held in *Harkins*, "the requirement that establishments provide auxiliary aids and services" limits the general rule encapsulated by the inventory exception. 603 F.3d at 672.

The inventory exception was intended to ensure that commercial enterprises, like stores, would not be required to have a different inventory for people with disabilities. In DOJ's examples demonstrating the application of the "inventory exception"—not requiring a bookstore to carry all its books in Braille – the entities would be required to change the very nature of their businesses in order to provide the alternative formats or auxiliary aides requested. *See* Department of Justice Title III Technical Assistance Manual § III-4.2500 (Accessible or Special Goods), *available at* http://www.ada/gov/taman3.html.[34]

DOJ identifies the "inventory exception" as another way of stating the affirmative defense that a public accommodation does not have to fundamentally alter its goods and services to comply with the ADA. Appendix C, Subpart C (Discussion of Section 36.302).[35] Here, far

---

[34] For that reason, MIT's reliance on *Jancik v. Redbox Automated Retail, LLC*, No. SACV 13-1387-DOC, 2014 WL 1920751 (C.D. Cal. May 14, 2014), is misplaced. The court in that case determined that the plaintiff's request for the retailer to stock closed-captioned DVDs was the equivalent of a request for a closed captioned videotape, falling squarely under the "accessible good" exception. *Id.* at *5. The same is not true here, where Plaintiffs simply request that MIT provide them with an auxiliary aid to allow them access to MIT's existing online video inventory.

[35] 42 U.S.C. § 12182 provides, in relevant part, that discrimination includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, *unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good.*" 42 U.S.C. § 12182(b)(2)(A)(iii) (emphasis added). Affirmative defenses are inappropriate for determination on a motion to dismiss, since MIT bears the burden of alleging and proving this defense. *See supra* at 4, 26-27, nn.21, 33; *Massachusetts v. E*Trade Access, Inc.*, 464 F. Supp. 2d 52, 58 (D. Mass. 2006).

from "fundamentally altering" the nature of its business, providing the means for deaf and hard

of hearing individuals to access the vast online offerings *furthers* MIT's mission of opening up

education to the world. *See supra* at 1, **5.** Once MIT has chosen to put content online for the

public, it cannot deny access to deaf and hard of hearing people by failing to provide auxiliary

aids and services necessary to ensure equal access. Indeed, ED has obtained closed captioning of

online content from several state universities under the ADA's Title II, which covers state and

local government entities, as well as the Rehabilitation Act. *See supra* at 22-23.

> **c.** **MIT Improperly Relies on Title III's Facility Construction,
> Alteration, and Physical Barrier Removal Rules to Avoid
> Plaintiff's Title III Discrimination Claim.**

As it did under the Rehabilitation Act, *see supra* at 25, MIT struggles to characterize this

case as an architectural barrier case that falls under Title III construction, alternation, and

physical barrier removal rules, but these rules simply do not apply to this case. Plaintiffs'

allegation, which must be taken as true at this stage, is that MIT's Online Platforms are aids,

benefits, or services of MIT. Compl. ¶ 104. Indeed, MIT acknowledges that the failure to provide

auxiliary aids for accessing the aural content implicates a communication barrier that is *not*

structural in nature. *See* MTD at 30, n.15.

Relying entirely on its mischaracterization of Plaintiffs' claims, MIT also invokes another

straw man argument – that the ADA Accessibility Guidelines for Buildings and Facilities

("ADAAGs") govern this case.[36] Those regulations define a public accommodation's obligation

---

[36] MIT supports its characterization of Plaintiffs' claim as relating to "design" by citing to
Paragraph 8 in the Complaint. Paragraph 8, however, lacks any reference to a request for a
structural change to MIT's website, and instead generally refers to MIT's timely and accurately
captioning only "a fraction of [its online] content, and even then inadequately." Compl. ¶ 8.
Plaintiffs have only requested that MIT "provide timely, effective communication through
comprehensive and accurate captioning of the online content." *Id.* at p. 30 (Prayer for Relief).

to remove structural communication barriers if removal is readily achievable. 28 C.F.R. §
36.304. Structural communication barriers are defined as an "integral part of the *physical
structure* of a facility." Nondiscrimination on the Basis of Disability by Public Accommodations
and in Commercial Facilities, 56 Fed. Reg. 35544, 35568 (July 26, 1991) (explaining 28 C.F.R. §
36.304) (emphasis added).

The barrier removal regulations themselves state that they do not apply to auxiliary aids:
any issue regarding a public accommodation's "obligation to provide communications equipment
and devices . . . is more appropriately determined by the *requirements for auxiliary aids under
[28 CFR §] 36.303*." *Id.* at 35555 (emphasis added). In *Innes*, 29 F. Supp. 3d at 580, the court
rejected a similar defense based on the fact that Title II architectural regulations do not address
video captioning at athletic sites. Accordingly, MIT's attempt to set up and then knock down a
structural claim must be rejected.[37]

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Stay or Dismiss should be denied.

---

MIT's characterization that Plaintiffs have made a "design" claim does not somehow trigger an
assessment of Plaintiffs' claim under the Design Standards in the ADAAG to measure its ADA
liability. *Colo. Cross-Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1219
(10th Cir. 2014).

[37] In support of its architectural barrier argument, MIT cites various cases that directly
address architectural features subject to ADAAG requirements. *See, e.g.*, *E*Trade Access*, 2005
WL 2511059 (automatic teller machines); *United States v. Nat'l Amusements, Inc.*, 180 F. Supp.
2d 251 (D. Mass. 2001) (stadium seating at movie theater); *Snyder v. Lady Slings the Booze,
LLC*, No. 3:12-CV-00659-CRS, 2014 WL 7366665 (W.D. Ky. Dec. 24, 2014) (four-inch step at
the entrance of defendant's building); *Thomas v. Northwest Airlines Corp.*, No. 08-11580, 2011
U.S. Dist. LEXIS 91149 (E.D. Mich. Aug. 16, 2011) (accessible pedestrian bridge and
emergency egress). Those cases are not helpful for clarifying MIT's obligations here, since
Plaintiffs have requested an auxiliary aid, not removal of architectural barriers.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Plaintiffs hereby request a hearing on Defendant's Motion to Stay or Dismiss, ECF No. 25, filed with the Court on May 11, 2015.

Dated:  June 25, 2015

Respectfully submitted,

/s/ *Thomas P. Murphy*

Caroline E. Jackson, Esq.*
Marc P. Charmatz, Esq.*
THE NATIONAL ASSOCIATION OF
THE DEAF
LAW AND ADVOCACY CENTER
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-1788
TTY: (301) 587-1789
caroline.jackson@nad.org
marc.charmatz@nad.org

Thomas P. Murphy, Esq., Board of Bar Overseers
no. 630527
DISABILITY LAW CENTER, INC.
32 Industrial Drive East
Northampton, Massachusetts, 01060
(413) 584-6337 / (800) 222-5619 Voice
tmurphy@dlc-ma.org

Timothy P. Fox*
Sarah M. Morris*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
104 Broadway, Suite 400
Denver, CO 80203
Telephone: (303) 757-7901
tfox@creeclaw.org
smorris@creeclaw.org

Christine M. Griffin, Esq., Board of Bar Overseers
no. 564420
Stanley J. Eichner, Esq., Board of Bar Overseers
no. 543139
Richard M. Glassman, Esq., Board of Bar
Overseers no. 544381
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, MA 02108
(617) 723-8455 / (800) 872-9992 Voice
cgriffin@dlc-ma.org
seichner@dlc-ma.org
rglassman@dlc-ma.org

Arlene B. Mayerson, Esq.*
Namita Gupta, Esq.*
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND
3075 Adeline Street, Suite 210
Berkeley, CA 94703
Telephone: (510) 644-2555
amayerson@dredf.org
ngupta@dredf.org

Bill Lann Lee*
Julie Wilensky*
LEWIS, FEINBERG, LEE, RENAKER &
JACKSON, P.C.
476 9th Street
Oakland, CA 94607-4048
Telephone: (510) 839-6824
blee@lewisfeinberg.com
jwilensky@lewisfeinberg.com

Attorneys for Plaintiffs and Proposed Plaintiff
Class

* Application for admission pro hac vice granted.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 25th day of June 2015, the foregoing document was served upon all counsel of record through this Court's electronic filing system as identified in the Notice of Electronic Filing.

<div align="right">

*/s/ Thomas P. Murphy*

</div>